IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
July 23, 2019 Session

## STATE OF TENNESSEE v. HOWARD MELTON

**Appeal from the Criminal Court for Knox County
No. 106609   Bobby R. McGee, Judge**

_____

### No. E2018-01281-CCA-R3-CD

_____

Defendant, Howard Melton, was convicted of assault by offensive touching and sexual battery by an authority figure.  As a result of the convictions, the trial court sentenced Defendant to serve four years in incarceration, consecutively to the sentence Defendant received in a separate case.  After the denial of a motion for new trial, Defendant appealed, arguing that the trial court improperly admitted a videotape into evidence.  Because the trial court did not abuse its discretion in admitting the evidence, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and ROBERT L. HOLLOWAY, JR., JJ., joined.

Keith Lieberman (at trial) and Gerald Gulley (on appeal), Knoxville, Tennessee, for the appellant, Howard F. Melton.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; Charme P. Allen, District Attorney General; and Rachel Russell and Joanie Steward, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The Knox County Grand Jury issued a presentment on October 27, 2015, charging Defendant with two counts of aggravated sexual battery and one count of sexual battery

by an authority figure for events that took place at Defendant's house involving one of his granddaughters, the victim.[1]

Defendant and his wife, Patty Melton, lived in Knox County. They had seven grandchildren. The victim was one of their granddaughters, born on July 15, 1996. She spent several weekends each month at her grandparent's home for "longer than [she] can remember." Defendant had an above-ground pool in his backyard that was visible from the street. The victim's cousin, one of Defendant's other granddaughters, often spent the weekend at Defendant's house while the victim was there. The victim's cousin was two weeks older than the victim. During their teen years, the girls stopped spending the night together at Defendant's house after Defendant told the victim that the victim's cousin hated her. The victim later found out that this was not true. Eventually, the victim made allegations that Defendant had touched her breasts on various occasions and touched her vagina on one occasion. Those allegations led to the issuance of the presentment at issue herein.

Prior to trial, the trial court discussed the preliminary matter of the introduction of videotapes found during the investigation of the case – one of which depicted the victim and her cousin in a swimming pool in Defendant's backyard and one of which depicted the victim and her cousin changing out of bathing suits on Defendant's back porch. The videotapes were taken in August of 2008, when the victim was 12. The top of the victim's bathing suit is pulled down in the pool videotape, exposing her breasts. The girls can be heard talking to Defendant on the videotape. The victim asks Defendant what piece of clothing she should take off next. Defendant can be heard telling the victim that he does not want her to take off her clothing. In the porch videotape, the victim and her cousin are seen changing out of bathing suits and into clothing on the back porch of Defendant's house. Both of the girls are in various stages of undress. The porch videotape is taken through a set of blinds and it does not appear that the girls know they are being filmed.

The State informed the trial court that the videotapes were being offered to establish "that the intent was for sexual arousal or gratification." The State told the trial court that the videotapes were taken during the time frame alleged in the indictment for the sexual batteries and were relevant to show intent because "the victim takes off her top, and [Defendant] continues to actually zoom in to her breasts, her nude breasts, on multiple occasions." Counsel for Defendant objected to the introduction of the videotapes, claiming that they were "evidence of uncharged crimes" and "whatever probative value [they have] is outweighed by the danger of prejudice." Counsel for Defendant argued that they were inadmissible under "403 and 404." The State responded that nothing in the videotapes was charged as a crime because the acts were "outside the

---

[1] It is the policy of this Court to protect the identities of minor victims of sex crimes.

statute of limitations." The State further argued that the videotapes were not being introduced "strictly as a prior bad act" but that they were being used "directly to [show] intent" of Defendant's "behavior during the exact same time frame that he is actively touching the victim's breasts."

After viewing the videotapes, the trial court determined that the videotapes "pertain to what his intentions were during this period of time, and [they are] certainly probative of his interest in the bare bodies of these young girls." The trial court continued:

> On the other hand, it is not him directly - - it's not - - it's not such that it's going to inflame the passions of the jury. It's all fairly - - well, I'm not sure what word to use, but it's not like he's directing a porno film with the little girls. It's more innocent than that. I don't think - - I think it is probative. And the danger of unfair prejudice is not that great, given what you actually see on the video, and some of it actually could be arguably beneficial to him at one point.[2]

The trial court concluded by finding that the videotapes were admissible.

The victim was twenty-one years old at the time of trial. She recalled spending the night at Defendant's house on a weeknight during the summer when she was eleven years old. On this particular occasion, the victim was the only grandchild spending the night at Defendant's house. The victim slept in the back bedroom of the house and wore a pink nightgown to bed. The victim explained that she wore the pink nightgown "[a]ny time [she] went over there, up until [she] was about [fifteen]." The victim woke up that particular morning when she "felt like a small pressure down in [her] pelvic area." She was "laying on [her] stomach with [her] nightgown pulled up, with [her] panties pulled to the side, and [Defendant] was stroking [her] vagina" on the outside with his fingers. The victim opened her eyes "for about four seconds" before closing them again. She did not actually see Defendant when she opened her eyes. The victim explained she was in "shock," so she "stayed still" and "acted like [she] was still asleep" until Defendant eventually stopped. The victim watched Defendant leave the room. Mrs. Melton was not at the house when this occurred. She typically left for work each morning around 7:00 a.m.

On other occasions, Defendant would "grab" the victim's "boobs." This behavior started when she was 12 and lasted "up until March of 2015," and occurred more times than she could remember. The victim recalled Defendant grabbed her breasts "[m]ost

---

[2] Defendant introduced testimony at trial about the victim's behavior and testified that he made the videotapes in order to show her parents how her behavior was out of control.

any time [she] went over" to Defendant's house. Defendant "would just walk up to [her] and take his hands and grab [her] boobs, and he would squeeze them, and he'd make a comment." Defendant's hands "linger[ed]" on her breasts. Defendant also came up from behind her, gave her a "bear hug", and grabbed her breasts with both hands. Defendant asked her why she "was wearing a bra or why [she] was always wearing a bra." Defendant also commented on the size of her breasts. The victim did not think that Defendant was being playful and even asked him why he grabbed her breasts. Defendant told her he was her "[P]apaw" and "wouldn't do anything to hurt [her]."

The victim described a particular day when she was 12 years old on which her grandmother took her shopping for new bras. When they returned to the house, her grandmother "wanted [her] to try [her] bras on and show them to [Defendant]." When the victim put the bras on as instructed and walked out into the living room to show Defendant, he "grabbed [her] boobs and asked why there was so much padding in the bra."

On another occasion, the victim and Defendant were working on a jigsaw puzzle. Defendant rubbed the victim's neck and then put his hand down into her bra and grabbed her breasts. She was 15 or 16 when this happened. It made the victim feel "really uncomfortable." The victim explained that she kept going over to her grandparents' home despite Defendant's behavior because she wanted to "spend time with [her] Mamaw."

The victim testified that Defendant had a video camera that he used "[a]ll the time." The victim, along with the jury, viewed the videotaped dated August 23, 2008. She did not remember Defendant operating the video recorder. She testified it depicted her "in the pool without a top on." The victim was 12 at the time. The victim explained that she and her cousin "were messing around and pulling at each other's tops." In the videotape, the victim and her cousin can be seen in the pool in Defendant's back yard. At first, the victim appears on the videotape with a green circular float around her midsection. After a few seconds, the victim removes the green float from around her waist. At that point, it becomes evident that the top of the victim's one-piece bathing suit is flipped down toward her waist, exposing her breasts. On the tape, the victim can be heard asking Defendant what piece of clothing he wanted her to take off. The victim admitted that Defendant told her he did not want her to take anything off and told her to put her top back on. The victim asked Defendant if they "got naked" if he "was going to come down" to the pool. According to the victim, Defendant made this videotape after he grabbed her breasts for the first time.

That same afternoon, Defendant also took video of the victim and her "cousin changing on the back porch." The victim explained that they were changing on the back porch because they "were not allowed to walk through the house with wet clothes on."

Again, the victim was unaware that Defendant was videotaping them while they were changing. The victim denied being topless outside on any other occasion.

The victim reported Defendant's behavior for the first time to her mother when she was fourteen years old. Her mother did not believe her. The victim then told her cousin about Defendant's actions in May of 2015. The victim told her parents again. This time, Defendant's actions were reported to the police.

On cross-examination, the victim admitted that she had a conviction for theft. She explained that she was shopping with a juvenile and the juvenile concealed an item in a diaper bag. The victim testified that she accepted responsibility for the actions of the juvenile.

Johnathan Harris, an investigator in the Special Crimes Unit of the Knoxville Police Department, testified that he investigated child abuse (both physical and sexual), elder abuse, human trafficking, missing persons, and runaways as well as domestic violence. Investigator Harris explained that in cases involving child sexual abuse, a referral is made to the Department of Children's Services ("DCS"). Investigator Harris interviewed the victim after her parents made a complaint. The interview was recorded. As part of the investigation, a search warrant was procured and executed for Defendant's residence. During the search, Investigator Harris confiscated the two videotapes depicting the victim and her cousin swimming in the pool topless and changing clothes on the back porch. The videos contained "breaks" and appeared as though they had been edited or recorded over.

Defendant's neighbor, Terri Harris, testified for the defense. She explained that she lived across the street diagonally from Defendant and his wife. Defendant's house was located on the corner and his yard contained a stop sign. There was a middle school located on the same street. Ms. Harris had a "complete view of [Defendant's] house and the stop sign" from her house. On one particular occasion, Ms. Harris heard a "banging sound" around midnight or 1:00 a.m. She "went outside on [her] porch" and saw the victim "banging on the stop sign." As cars passed by the stop sign, the victim "lift[ed] her shirt up" and waved at cars. Ms. Harris yelled at the victim and told her to get in the house. Ms. Harris claimed that the victim responded with curse words, told her to "shut [her] damn mouth," and said that it was "none of [her] f***ing business." Ms. Harris saw the victim do this at least two more times during the middle of the night and two times during broad daylight, about 2:30 p.m. around the time of school pickup. Ms. Harris informed Defendant and his wife each time she saw the victim outside acting in this manner. All of these incidents occurred during "the same few months" when the victim was eleven years old.

Defendant testified at trial. He explained that his house was on the corner of Whittle Springs and Underwood Place and that his swimming pool was visible from the street. Defendant recalled that his grandchildren often spent the night at his house and that he had "[n]o real issues out [of the victim]" but that she "loved attention" and "was real loud all the time." He tried to "mentor" his grandchildren and "be a Papaw." Defendant stated that he was "raised with morals and standards" and that he "taught" his own children the same.

Defendant admitted that he videotaped the girls in the pool. Defendant claimed that before he went outside to the pool area, there were three or four other kids outside in addition to the victim and her cousin. Three of the kids were on bicycles and one was on a skateboard. Defendant was concerned because the kids had their tires up against the pool, and he was afraid they would tear a hole in the pool, so he went outside and told the kids to "back off." Defendant went back inside the house while the victim and her cousin remained in the pool. Defendant went outside a few minutes later with his video camera. He "went out there just to shoot because they [were] having fun." Defendant claimed that he did not know when he went outside that the victim had her top off. He "just was filming her and zoomed in on her, and she moved" the float and he saw that she had her top off. Defendant explained that on the videotape, he could be heard laughing and saying "busted" when the victim took the float off and exposed her breasts. Defendant admitted that he did not tell the victim to put her clothes back on and continued videotaping even after he saw her breasts.

Later on during his testimony, Defendant stated that he videotaped the victim in the pool because he was "trying to, you know, prove that she does things like that." Defendant made the videotape to "explain to [the victim's] father and mother that, you know, she was out of hand[.]" However, Defendant admitted that he never showed the videotape to the victim's parents. Defendant claimed that he talked to the victim's father about the incident. Defendant explained that this was not the first time the victim had exposed her breasts.

With regard to the videotape that showed the girls changing clothes on the back porch, Defendant first testified that he recorded the girls changing clothes outside because they were not doing what they were supposed to be doing. Then, Defendant testified that some "guy came through and said they was [sic] in the backyard naked." Defendant testified that the victim and her cousin normally changed clothes on the screened in porch after they were finished swimming in the pool and that he never told them they could not change inside the house. Defendant explained that he "told them not to come through the house dripping water because they're on the good carpet."

Defendant was aware that the victim and her cousin would sneak out of the house at night through the basement. Defendant recalled that sometimes the victim and her

cousin snuck out and went "down there at the laundromat late at night." The laundromat was about two blocks away. On one night in particular, Defendant recalled that a car pulled up in his driveway at night. A police officer asked if he had seen three kids running around outside and if he knew that his basement door was open. Defendant had not seen kids running outside but acknowledged that his basement door was open.

Defendant denied touching the victim's vagina while she was in her bed. Defendant denied ever touching the victim inappropriately or in a sexual way. Defendant also denied talking to the victim about sex but admitted that the following text message exchange took place between him and the victim:

Defendant: Okay. When will you be here?

The victim: 10 to 15 minutes, if that's okay.

Defendant: Okay. I'm practicing having sex.

The victim: With who? LOL.

Defendant: Me, myself, and I.

The victim's father, Defendant's son, testified on rebuttal that Defendant never told him that the victim was sneaking out of the house, lifting up her shirt, appearing nude in the swimming pool, or changing clothes on the back porch. The victim's father denied that Defendant ever offered to show him videotape of the victim in the pool with her breasts exposed. The victim's father testified that he was "very disappointed" in his father.

The State made an election of offenses. As to Count 1, the State did not make an election because the victim only testified as to one event during which Defendant touched her vagina. As to Count 2, the State elected to proceed on "the time when [the victim] was 12 years old, she went to buy bras with her grandmother. Once she returned to [Defendant's] residence, she showed [Defendant] her new bra. He grabbed her breasts in the living room, and he asked why her new bra was so padded." As to Count 3, the State elected to proceed on "the time that [the victim] discussed when she was 15 or 16 year[]s old, the defendant reached into her shirt and into her bra. He grabbed one of her breasts while she was working on a puzzle. She was sitting at the table in the back bedroom of [Defendant's] residence."

At the conclusion of the trial, the jury found Defendant not guilty of aggravated sexual battery in Count 1, guilty of the lesser included offense of assault by offensive touching in Count 2, and guilty of sexual battery by an authority figure in Count 3. The

trial court sentenced Defendant to six months for the assault by offensive touching conviction in Count 2 and four years for the sexual battery conviction in Count 3. The sentence in Count 2 was ordered to be served concurrently with the sentence in Count 3, and the sentence in Count 3 was ordered to be served consecutively to Defendant's sentence in a separate case. *See State v. Howard Melton*, No. E2017-00613-CCA-R3-CD, 2018 WL 934650, at *8 (Tenn. Crim. App. Feb. 16, 2018) (upholding conviction for sexual exploitation of a minor and sentence of three years), *perm. app. denied* (Tenn. May 15, 2018). After the denial of a motion for new trial, Defendant appealed.

*Analysis*

On appeal, Defendant argues that the trial court erred by allowing the State to "play a salacious video made by the Defendant" that depicted the victim naked in a swimming pool and changing on the back porch "where the video was unfairly prejudicial and was used primarily to inflame the passion of the jury." Specifically, Defendant insists that the videotapes were "propensity evidence," were highly prejudicial, were not made sufficiently close in time to the conduct charged in Count 2 and Count 3, and "more probably than not affected credibility assessments of the witnesses." To support his argument, Defendant cites *State v. Rodriguez*, 254 S.W.3d 361, 377-78 (Tenn. 2008), where the Tennessee Supreme Court concluded that the trial court erred in admitting child pornography found at the defendant's house because it suggested that the defendant had a tendency to molest children. Defendant analogizes the videotapes admitted at trial in his case to the child pornography possessed by the defendant in *Rodriguez* to support his argument that the videotapes were highly prejudicial propensity evidence and essentially forced Defendant to testify and be subjected to a "strenuous cross-examination by the State." The State distinguishes *Rodriguez* and insists that the trial court acted within its discretion in admitting the evidence under Rule 403, that the videotapes were also properly admissible under Rule 404(b), and that any error in the admission of the evidence was harmless.

Questions concerning the admission or exclusion of evidence rest within the sound discretion of the trial court, and this Court will not interfere with the exercise of this discretion in the absence of a clear abuse appearing on the face of the record. *See State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *State v. Van Tran*, 864 S.W.2d 465, 477 (Tenn. 1993); *State v. Harris*, 839 S.W.2d 54, 73 (Tenn. 1992). An abuse of discretion occurs when the trial court applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006) (citing *Howell v. State*, 185 S.W.3d 319, 337 (Tenn. 2006)).

The threshold issue with regard to the admissibility of a piece of evidence is relevance. Relevant evidence is evidence "having any tendency to make the existence of

any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. "Evidence which is not relevant is not admissible." Tenn. R. Evid. 402. Even if evidence is deemed relevant, it may be still be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Additionally, "[e]vidence of a person's character or trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." Tenn. R. Evid. 404(a). However, "[e]vidence of other crimes, wrongs, or acts" may be admissible for "other purposes," such as proving identity, criminal intent, or rebuttal of accident or mistake. Tenn. R. Evid. 404(b); *State v. Thacker*, 164 S.W.3d 208, 239-40 (Tenn. 2005). Under Rule 404(b), the evidence must be excluded "if its probative value is outweighed by the danger of unfair prejudice." Tenn. R. Evid. 404(b)(4).

We must first determine whether the admissibility of the evidence should have been analyzed under Rule 403 or 404(b). "Rule 403 is a rule of admissibility, and it places a heavy burden on the party seeking to exclude the evidence." *State v. James*, 81 S.W.3d 751, 757 (Tenn. 2002). On the other hand, most authorities suggest that trial courts take a "restrictive approach of 404(b) . . . because 'other act' evidence carries a significant potential for unfairly influencing a jury." Neil P. Cohen et al., *Tennessee Law of Evidence* § 4.04[8][e] (4th ed. 2000). Traditionally, courts of this state have viewed any testimony of prior bad acts by a defendant as inadmissible when used as substantive evidence of guilt of the crime on trial. *State v. Parton*, 694 S.W.2d 299, 302-03 (Tenn. 1985). In those instances where the prior conduct or acts are similar to the crimes on trial, the potential for a prejudicial result increases. *State v. Bordis*, 905 S.W.2d 214, 232 (Tenn. Crim. App. 1995).

As set forth above, Rule 404(b) applies only to "bad acts," *State v. Clark*, 452 S.W.3d 258, 289 (Tenn. 2014), and testimony about behavior which is relevant and which does not constitute a crime or bad act is not analyzed under the Rule. *State v. Reid*, 213 S.W.3d 792, 814 (Tenn. 2006) (determining that possession of a gun, standing alone, does not constitute a crime and therefore evidence of ownership of a gun is not a bad act). However, behavior that, while not criminal, constitutes a "moral 'wrong'" must also meet the strictures of Rule 404(b). *Clark*, 452 S.W.3d at 289 (categorizing possession of pornography as potentially being perceived as a "moral wrong" by some members of society). This Court has previously held in child rape cases that an adult giving a minor a romantic kiss and inviting the minor to spend the night in a note as well as testimony from the victims' mother regarding the defendant's controlling behavior are "bad acts" which require the application of the Rule. *See State v. Margaret L. Holt*, No. E2010-02128-CCA-R3-CD, 2012 WL 826523, at *11 (Tenn. Crim. App. Mar. 13, 2012), *no perm. app. filed*; *State v. Marcus Smartt*, No. M2014-01093-CCA-R3-CD, 2015 WL

3563024, at *7 (Tenn. Crim. App. Apr. 22, 2015), *no perm. app. filed*. Thus, regardless of whether the videotapes in this case constitute a crime or simply a "bad act," we agree that they have the potential to reflect upon Defendant's character and are properly analyzed under Rule 404(b).

Next, we must determine whether the trial court substantially complied with Rule 404(b)'s procedural requirements prior to admitting the evidence in order to determine the appropriate standard of review. *DuBose*, 953 S.W.2d at 652 (applying abuse of discretion standard when trial court substantially complies with the procedural requirements of Rule 404(b)(1)-(4)). As required by Tennessee Rule of Evidence 404(b)(1), the trial court properly considered the admissibility of the videotapes outside the presence of the jury, doing so prior to the start of the trial. The trial court determined that the videotape evidence was relevant to Defendant's intent, a material issue in the case, as required by Tennessee Rule of Evidence 404(b)(2). The date stamp on the videotapes indicated that they were made one month after the victim turned twelve or about one month after the alleged abuse started, and thus fit within the time frame of the indictment. The trial court determined that the videotapes were "certainly probative of his interest in the bare bodies of these young girls" and thus were relevant to show "what [Defendant's] intentions were during this period of time." Although the trial court did not expressly state that the evidence of "the other crime, wrong, or act" was "clear and convincing" as required by Rule 404(b)(3), there was no dispute that Defendant videotaped the victim and her cousin in the pool and while changing on the back porch − Defendant's testimony confirmed as such. Finally, the trial court determined that the "danger of unfair prejudice is not that great, given what you actually see on the video, and some of it actually could be arguably beneficial to [Defendant] at one point." In other words, the trial court determined that the probative value was not outweighed by the danger of unfair prejudice. Tenn. R. Evid. 404(b)(4). In fact, the trial court noted the defense theory was that Defendant videotaped the victim and her cousin to show the victim's parents that the victim was out of control, making the videotapes highly probative and minimizing any prejudice resulting from their admission.

In our assessment, the trial court herein substantially complied with the procedural requirements of 404(b), so our review is limited to whether the admission of the evidence qualified as an abuse of discretion. Our supreme court recently stated that the abuse of discretion standard of review is a "less rigorous review" of a trial court's decision and does not permit this Court to substitute its judgment for that of the trial court. *State v. Quintis McCaleb*, ___ S.W.3d ___, No. E2017-01381-SC-R11-CD, 2019 WL 3940922, at *6 (Tenn. Aug. 21, 2019) (quoting *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)). On review, courts should determine "(1) whether the factual basis for the [trial court's] decision is properly supported by evidence in the record, (2) whether the [trial] court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the [trial] court's decision was within the

range of acceptable alternative dispositions." *Id.* (quoting *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)) (citations omitted). Moreover, Defendant's own testimony was that he videotaped the victim because he wanted to show her parents that she was out of control. In fact, he can be heard saying "busted" at the beginning of one of the recordings and can be heard telling the victim that he does not want her to take off her bathing suit in the swimming pool. The trial court determined the videotapes were introduced to show Defendant's intent to commit the crimes for which he was on trial. Clearly, the jury, by its verdict in acquitting Defendant of aggravated sexual battery in Count 1 and finding Defendant guilty of the lesser included offense of assault by offensive touching in Count 2, at least partially rejected the allegations that Defendant touched the victim's body for the purposes of sexual arousal or gratification.[3] The trial court herein did not abuse its discretion in admitting the contents of the videotapes as evidence.

*Conclusion*

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
TIMOTHY L. EASTER, JUDGE

---

[3] Even if we were to determine that the evidence should have been analyzed under Rule 403, we would determine that the trial court properly admitted it because the standard in Rule 404(b) is more restrictive than the standard in Rule 403.